**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BUONADONNA, *et al.*,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>SOUTHEAST DELCO SCHOOL DISTRICT,<br>*et al.*,<br><br>                    *Defendants*. | CIVIL ACTION<br>NO. 14-02708 |

<u>**MEMORANDUM**</u>

**PAPPERT, J.**                                                              **May 18, 2015**

While riding home on a school bus, Plaintiffs C.J. Buonadonna ("Buonadonna") and

Dylan Fonner ("Fonner") (collectively "Plaintiffs") were attacked by other students who had

been bullying them earlier in the school day.  Plaintiffs filed a complaint ("the complaint") on

May 12, 2014 against Defendants Southeast Delco School District ("School District"), Delaware

County Intermediate Unit ("DCIU"), and bus driver Hykeem Green ("Green") (collectively

"Defendants").  (ECF No. 1.)  Summarized broadly, the complaint contended that the Defendants

should have prevented or intervened to stop the attack and that their failure to do so violated the

Plaintiffs' constitutional rights.

The School District, DCIU and Green each filed motions to dismiss the complaint.  (ECF

Nos. 6, 10, and 21-22.)  The Court held oral argument on the motions on February 20, 2015.

(ECF No. 26.)

On March 3, 2015, the Court issued a Memorandum Opinion and Order granting

Defendants' motions, finding that the complaint failed to allege facts sufficient to state a claim

for relief.  (ECF Nos. 27-28.)  The Court granted Plaintiffs' leave to amend their complaint and on March 23, 2015, the Plaintiffs did so.  The amended complaint asserts four claims:  a *Monell* claim against the School District and DCIU for failing to train, supervise or discipline Green (Count I); a due process claim for "deprivations of liberty" and false imprisonment under § 1983 and state law against Green (Count II); a claim for intentional infliction of emotional distress against Green (Count III); and a state-created danger claim against all Defendants (Count IV).[1] (ECF No. 30.)  Defendants renewed their respective motions to dismiss, (ECF Nos. 31-34), and Plaintiffs filed an omnibus response to all three motions.  (ECF No. 35.)

The new averments in the amended complaint are an amalgam of legal conclusions couched as facts, factual contentions which contradict assertions in the complaint, and facts which do not do enough to raise the Plaintiffs' right to relief above the speculative level.  For these reasons and others stated below, the Defendants' motions are granted and the amended complaint dismissed.

**<u>Background</u>**

Buonadonna and Fonner were students at The County Alternative High School ("TCA"), an alternative school operated by DCIU.  (Am. Compl. ¶ 13; Mem. in Supp. of DCIU Mot. Dismiss 1; Pls.' Opp'n to Mot. Dismiss 1.)[2] DCIU is a state-created educational services agency that services the school districts of Delaware County, Pennsylvania, including Defendant School District, wherein TCA is located.  (Am. Compl. ¶ 4; Mem. in Supp. of DCIU Mot. Dismiss 1.)

---

[1]      Counts I-IV in the original complaint and amended complaint bring identical causes of action.  (*Compare* Compl. ¶¶ 45-58 *with* Am. Compl. ¶¶ 46-67.)  The only exception is that Count II in the amended complaint includes "false imprisonment under Pennsylvania state law" in the title.  (Am. Compl. ¶¶ 54-57.)

[2]      As Plaintiffs' brief in opposition to the Defendants' motions to dismiss lacks pagination, all citations to Plaintiffs' opposition brief in this memorandum will refer to ECF page numbers.

On October 9, 2013, Plaintiffs were targets of "teasing, bullying and threats of physical assault" at TCA.  (Am. Compl. ¶ 14.)  Before Fonner left school, he allegedly "went to the principal's office and told administrators that he feared he would be physically assaulted if he got onto the bus [home] that day.  The principal and administrators at DCIU ignored this fear even though [Fonner] made administrators aware of prior assaults on District [s]chool buses."  (*Id*. ¶ 15.)

That afternoon, Plaintiffs boarded a school bus[3] with three of the students who had been harassing them.[4]  (*Id*. ¶¶ 16, 21.)  Green, an employee of the School District and DCIU, drove the bus.[5]  (*Id*. ¶¶ 17-18.)  The School District and DCIU allegedly knew that Green had a criminal record for assault and false imprisonment and that he had prior traffic infractions.  (*Id*. ¶¶ 19-20.)

During the trip, the three other students confronted Plaintiffs, who were sitting at the front of the bus "approximately 6 feet or less from Defendant Green."  (Am. Compl. ¶¶ 21-23.)

---

[3]      At the February 20 oral argument, it was clarified that although the parties use the term "bus," the vehicle that transported Fonner and Buonadonna home from TCA was actually a van carrying approximately 5-6 children. (Hr'g Tr. 22:10-19 Feb. 20, 2015, ECF No. 36.)  For ease of reference, the Court will continue to use the parties' terminology of "bus" for the purposes of analyzing the amended complaint and the Defendants' motions.

[4]      The complaint alleges that three students who bullied Plaintiffs boarded the bus, but does not indicate how many students in total had been harassing Plaintiffs at school that day.  (Am. Compl. ¶¶ 14, 21.)  In their response to the Defendants' motions to dismiss, Plaintiffs inconsistently argue that only two students bullied Plaintiffs and later boarded the school bus.  (Pls.' Opp'n to Mot. to Dismiss 2-3.)

[5]      In its motion to dismiss the amended complaint, DCIU argues that Green was not its employee.  (DCIU Mem. in Supp. of Mot. Dismiss 1.)  Rather, DCIU states that the School District was responsible for transporting TCA's students to/from school and accordingly the School District employed Green as required under the Pennsylvania Public School Code.  (*Id*.)  At oral argument on the Defendants' motions to dismiss the original complaint, Plaintiffs contended that while Green may not technically have been an employee of DCIU, it is unclear whether he maintained some relationship with DCIU.  (Hr'g Tr. 9:20-10:3.)  In its March 3 Memorandum Opinion, the Court requested that Plaintiffs clarify, if possible, their allegations regarding Green's relationship to DCIU and the School District in the amended complaint.  (ECF No. 27, at 2 n.3.)  The amended complaint contains no clarification, though for the purposes of a motion to dismiss the Court must accept as true all allegations in the complaint, even if doubtful in fact.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although doubtful in fact, the Court will proceed under the assumption that Green was an employee of both the School District and DCIU for the purposes of deciding the present motions to dismiss.

At one point, the students called Plaintiffs racist and threatened them.  (*Id.* ¶¶ 21-22.)  Green responded to the taunt by telling the students, "Yo, leave him alone man for real." (*Id.* ¶ 24.)  Notwithstanding Green's admonition, one of the students punched Fonner in the face four times.  (*Id.* ¶ 25.)

Fonner stood up and confronted the student, accusing him of a hate crime and threatening to report the incident.  (Am. Compl. ¶ 26.)  The student cursed at Fonner in response.  (*Id.*)  Green again interjected, stating, "[y]ou all gotta sit down man."  (*Id.* ¶ 27.)  Nonetheless, a second student punched Fonner, knocking him into Buonadonna.  (*Id.* ¶ 28.)

Fonner asked Green to let him off the bus, but Green replied, "I can't let you off the bus man." (Am. Compl. ¶¶ 29-30.)  Fonner then told Green, "I'll call my mom if you don't let us off the bus." (*Id.* ¶ 32.)  Green "still refused" to let Plaintiffs off the bus, "even though Fonner asked to get off the bus . . . just blocks from the City of Chester Police Department."  (*Id.*)  The other students cheered Green's refusal.  (*Id.* ¶ 33.)  Plaintiffs allege that the students "continued to threaten and batter" them until "Green eventually let both Plaintiffs off the bus at an undesignated stop."[6]  (*Id.* ¶¶ 34, 36.)  Green was "aware that both boys were injured and bleeding,"[7] but did nothing to help them off the bus.  (*Id.* ¶ 38.)  Plaintiffs allege that Defendants never reported this incident to authorities, and that Green was never disciplined as a result of this incident.  (Am. Compl. ¶¶ 35, 39-40, 45.)

---

[6]     In their original complaint, Plaintiffs stated that Green let them both off the bus at Buonadonna's residence. (Compl. ¶ 35.)  It is unclear from their current allegation of "undesignated stop" whether Plaintiffs now aver that Green let them off the bus at Buonadonna's residence or someplace else.  This is a distinction without a difference for our present purposes, however, because a school's alleged failure to follow its own policies generally does not rise to the level of an affirmative act for the purposes of a state-created danger claim.  *See Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 824 (2013); Parts II-III, *infra*.

[7]     The Plaintiffs alleged that they were both "injured and bleeding" in their original complaint as well. (Compl. ¶ 36.)  At the February 20 oral argument, however, Plaintiffs' counsel acknowledged that Buonadonna, who was never struck by the bullies, sustained only alleged "emotional, not physical" injuries.  (Hr'g Tr. 14:18.)  The amended complaint nonetheless again asserts that both boys were "injured and bleeding."  (Am. Compl. ¶ 38.)

Plaintiffs brought this action contending that the School District and DCIU failed to train Green "regarding what actions to take during a student assault on a school bus" and that they "had a policy to keep children on a school bus until their assigned stops even while students were being battered, and facing an immediate threat of continued danger to life and liberty."  (Am. Compl. ¶¶ 41-42.)  Plaintiffs also allege that the School District and DCIU "were aware that numerous student assaults occurred on their school buses and did nothing to train and supervisor [sic] their bus drivers regarding policies and procedures to protect students from assaults and report assaults to the police and the district."  (*Id.* ¶ 50.)

**Standard of Review**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *i.e.*, sufficient facts to permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009) (quotation and citation omitted).

The court must construe the complaint in the light most favorable to the plaintiff.  *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)).  However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts.  *Iqbal,* 556 U.S. at 678.  "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the

5

complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## Discussion

Given the somewhat jumbled and overlapping nature of the counts in Plaintiffs' amended complaint, the Court will treat Plaintiffs' claims out of order.

### I.    False Imprisonment under § 1983 Against Green (Count II)

As the Court explained in its March 3 Memorandum Opinion, this claim cannot stand as a matter of law.  (ECF No. 27, at 9.)  The Third Circuit has recognized § 1983 claims for false imprisonment, but only in the context of unlawful arrests or detentions at the hands of law enforcement.  *See, e.g., Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) ("A false imprisonment claim under 42 U.S.C. § 1983 is based on the Fourteenth Amendment protection against deprivations of liberty without due process of law. . . . where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest.  A false imprisonment claim under § 1983 which is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures.") (citations omitted).

Plaintiffs ignored the Court's analysis and again pled a § 1983 claim for false imprisonment against Green in Count II of the amended complaint.  Plaintiffs have not, however, cited to any authority in this Circuit recognizing a § 1983 claim for false imprisonment outside of the law enforcement context, much less in the context of a school bus ride.  To the contrary, the Supreme Court of the United States has warned that "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." *Baker v. McCollan*, 443 U.S. 137, 146 (1979).  The Supreme Court has also counseled against

confusing constitutional and tort law in this area.  *See id.* ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.  Remedy for the latter type of injury must be sought in state court under traditional tort-law principles.").  Thus, while Plaintiffs may be able to state a common law tort claim against Green for false imprisonment,[8] they cannot do so as a matter of law under § 1983. Plaintiffs' false imprisonment claim under § 1983 is dismissed.

## II.     Violation of Due Process under State-Created Danger Theory Against Green (Count IV)

It has been long established by the United States Supreme Court that the state owes no affirmative duty under the Constitution to protect citizens from the tortious acts of private individuals.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195-96 (1989). An exception to this general rule applies when the state itself is alleged to have created the danger to the plaintiff.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  In such a case, the state may be found to violate the citizen's right to substantive due process under the Fourteenth Amendment. *See Morrow v. Balaski*, 719 F.3d 160, 166-67 (3d Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 824 (2013).

To establish a viable claim under this state-created danger theory, the Plaintiffs must show:

> (1) the harm ultimately caused to the Plaintiffs was foreseeable and fairly direct;
>
> (2) the state actor acted with a degree of culpability that shocks the conscience;
>
> (3) there existed a relationship between the state and the Plaintiffs such that the Plaintiffs were foreseeable victims of the Defendants' acts, or a member of a discrete class of persons subjected to the

---

[8]     The Court addresses Plaintiffs' state law false imprisonment claim against Green separately.  *See* Part IV, *infra.*

> potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) the state actor affirmatively used his authority to create a danger to the Plaintiffs or render the Plaintiffs more vulnerable to danger than had the state not acted at all.

*Id.* at 177 (citing *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).  Like the Third Circuit in *Bright*, the Court finds it unnecessary to consider anything other than the fourth prong of this analysis in deciding whether Count IV of the amended complaint states a viable claim against Green.  *See Bright*, 443 F.3d at 283.

The Third Circuit has stressed that "under the fourth element of a state-created danger claim, liability . . . is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger."  *Bright*, 443 F.3d at 282 (emphasis in original) (quotation and citations omitted).  It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.  *Id*.  For this reason, the "Third Circuit has repeatedly rejected state-created danger claims in cases involving student-on-student school violence, even where school officials were alleged to have known of the dangerous conditions within the school that ultimately resulted in injury to the plaintiff, on the ground that the schools did not affirmatively act to create the danger."  *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 610 (E.D. Pa. 2014) (citing *Morrow,* 719 F.3d at 178-179; *Brown v. Sch. Dist. of Philadelphia*, 456 F. App'x 88, 89-90 (3d Cir. 2011); *D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir. 1992)).

To be sure, "the requirement of an actual affirmative act is not intended to turn on semantics of act and omission.  Instead, the requirement serves to distinguish cases where officials might have done more from cases where officials created or increased the risk itself."  *Morrow*, 719 F.3d at 179 (citation and quotations omitted).  This distinction is important because

the Supreme Court has warned that § 1983 is not a vehicle to incorporate liability for state law negligence into the Constitution.  *See DeShaney,* 489 U.S. at 202 ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation."); *see also Berg v. Cnty. of Allegheny,* 219 F.3d 261, 268 (3d Cir. 2000) ("Section 1983 . . . does not provide redress for common law torts—the plaintiff must allege a violation of a federal right.").  And while "the line between action and inaction may not always be clear, [the Third Circuit has] never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." *Bright*, 443 F.3d at 282 (citing *D.R.*, 972 F.2d at 1374).

In its March 3 Memorandum Opinion, the Court dismissed the state-created danger claim against Green because Plaintiffs failed to sufficiently plead the "affirmative act" element of the state-created danger test.  (ECF No. 27, at 10-12.)  Specifically, the Court found that Plaintiffs failed to show how Green affirmatively used his authority to create an opportunity for danger that otherwise would not have existed.  (*Id*. at 11.)  Plaintiffs have not cured this deficiency in the amended complaint.[9]

With regard to their amended state-created danger claim against Green, the Plaintiffs allege:

> 62.     The defendant, Hykeem Green placed plaintiffs in harm's way and increased danger to the plaintiffs, when he made the affirmative decision to prevent Plaintiffs from leaving the bus and reaching an area of safety.

---

[9]      At oral argument on the Defendants' motions to dismiss the original complaint, Plaintiffs' counsel in discussing Green's conduct asserted "[m]erely not acting is an affirmative action," (Hr'g Tr. 34:11-12), and that Green's "decision not to intervene was an affirmative act when he had a duty to intervene."  (*Id*. 34:25-35:1.)  This is an incorrect statement of the law in the Third Circuit, yet a belief which appears to permeate the amended complaint as well.

63.     Defendant Green placed plaintiffs in harm's way and increased a danger to the plaintiffs as he knew that after he let the plaintiffs of [sic] the bus, he was capable of stopping further assaults on the plaintiffs by merely holding the front door of the bus closed thus stopping the assailants from leaving the bus and chasing after the plaintiffs.[10]

64.     The deliberate indifference by defendant Green created and increased the danger of the plaintiffs' subsequent battery and injuries, and heightened plaintiffs' vulnerabilities to precisely the abuses and violations described above.

(Am. Compl. ¶¶ 62-64.)  Plaintiffs' allegations against Green have not fundamentally changed since the original complaint.  Plaintiffs' continue to argue that Green violated their constitutional rights because he did not let them to get off the bus when Fonner asked, despite their ongoing confrontation with other students.  Once again, Plaintiffs' allegations are insufficient as a matter of law because binding precedent in this Circuit is clear that Green's failure to act does not constitute the affirmative state action necessary for liability to attach under the state-created danger test.

The Third Circuit's decisions in *Morrow* and *Bright* are controlling here.  In *Morrow*, two sisters were subjected to a series of ongoing verbal threats and physical assaults by a fellow student, Anderson, which were reported to the school.  *Morrow*, 719 F.3d at 164.  Anderson was temporarily suspended, but was allowed to return to school.  *Id.*  Anderson later boarded the Morrow sisters' school bus (even though the bus did not service Anderson's home route) and proceeded to threaten and attack one of the sisters.  *Id.*  Eventually, rather than expel Anderson, the school advised the Morrows to relocate to another school.  *Id.* at 164-65.  The Morrows brought a § 1983 action against the school under the state-created danger theory, contending that

---

[10]     This new allegation seems to have been added to the amended complaint in response to the School District's contention at the February 20 oral argument that "the plaintiffs haven't shown why, if [Green] let Mr. Fonner and Mr. Buonadonna off [the bus], their two assailants couldn't have just gotten off the bus as well, and then you have four students fighting in the streets of Chester."  (Hr'g Tr. 24:21-25.)

allowing Anderson to board the Morrows' school bus was a sufficient "affirmative act." *Id*. at

177.  The Third Circuit rejected this argument:

> [T]he only reasonable interpretation of that allegation is that the
> Defendants *failed* to take any affirmative steps to ensure that
> Anderson did not board the Morrow children's bus.  Here again,
> the Complaint attempts to morph passive inaction into affirmative
> acts.  However, merely restating the Defendants' inaction as an
> affirmative failure to act does not alter the passive nature of the
> alleged conduct.

*Morrow*, 719 F.3d at 178-79 (emphasis in original).

Similarly, in *Bright*, a convicted felon named Charles Koschalk was on probation for

"corrupting the morals" of a 12-year-old girl.  443 F.3d at 278.  As a condition of his probation,

Koschalk was not permitted contact with the 12-year-old or any other minor.  *Id.*  County police

and probation officers were aware that Koschalk was continually violating his parole by trying to

restart his relationship with the young girl.  *Id*. at 278-79.  Koschalk subsequently murdered the

girl's 8-year-old sister as retaliation for her family's efforts to keep the 12-year-old away from

him.  *Id.* at 279.  The family sued the probation officers, asserting the officers failed to step in to

stop the probation violations and that those failures constituted the necessary affirmative acts

under the state-created danger test.  *Id*. at 279, 283.  The Third Circuit disagreed, stating in part

that the "reality of the situation described in the complaint is that what is alleged to have created

a danger was the failure of the defendants to utilize their state authority, not their utilization of it.

Bright has identified no action of the defendants that utilized their state authority in a manner

that rendered Annette more vulnerable to Koschalk than she would otherwise have been."  *Id*. at

284.

Under the precedent set in *Morrow* and *Bright*, Green's failure to let Fonner and

Buonadonna off the bus does not constitute an affirmative act under the state-created danger test.

Plaintiffs argue that their bus ride with Green can be divided into "four distinct portions," namely

(1) "events that occurred pre-assaults;" (2) "the first assault" (when a student punched Fonner in the face four times); (3) "the second assault" (when a second student punched Fonner, knocking him into Buonadonna); and (4) "the subsequent assaults following the second assault" (when the students "continued to threaten and physically batter" the Plaintiffs after Green refused to let them off the bus). (Pls.' Opp'n to Mot. to Dismiss 3, 11.) Plaintiffs claim that "[i]t was Green's actions after the second assault, *in affirmatively denying Plaintiffs [sic] demand to leave the bus and remove themselves from a present danger that gives rise to this action and the subsequent resulting assaults*." (*Id*. at 12) (emphasis in original). Plaintiffs do this throughout their response to Defendants' motions to dismiss—they attempt to characterize Green's failure to let them off the bus as "affirmative" conduct. (*See, e.g.*, *id*. at 14 ("In between the Second and Third assaults, Dylan Fonner asked Green to let him and Buonadonna off the bus. Green affirmatively refused."); *id*. at 15 ("Green merely needed to open the door to the bus and let the Plaintiffs, who were high school students, not kindergartners, walk off the bus to an area of safety. Green affirmatively chose not to") (emphasis removed).)

    As observed in the Court's March 3 Memorandum, Plaintiffs are attempting to do exactly what Third Circuit precedent does not allow—they are attempting to "redefine clearly passive inaction as affirmative acts." *Morrow*, 719 F.3d at 178. It is true that Green's failure to let Plaintiffs off the bus allowed their confrontation with the other students to continue, and that this may be one of those cases where the state official "might have done more." *Id*. at 179. But this is not a case where Green affirmatively used his authority to create the confrontation in the first place. "[N]onfeasance . . . do[es] not rise to the level of a constitutional violation." *D.R.*, 972 F.2d at 1376; *accord K.S. v. Sch. Dist. of Philadelphia*, No. 05-cv-4916, 2007 WL 1009815, at *4 (E.D. Pa. Mar. 28, 2007) ("K.S. attempts to recharacterize Wilson's alleged failure to report

acts of sexual misconduct as an affirmative act.  What K.S. alleges, though, is solely the failure

of Wilson to protect S.M. against the criminal behavior of a third party.  Under *Bright,* this

alleged failure to act is not an affirmative act under the state-created-danger test.").

      Nor does it matter, as Plaintiffs contend, that Green personally witnessed the fight

between Plaintiffs and their attackers.  The Third Circuit has explained that such personal

knowledge does not change the state-created danger analysis under Supreme Court precedent.

*See Bright*, 443 F.3d at 284 ("[W]e know from *DeShaney* that no affirmative duty to protect

arises 'from the State's knowledge of the individual's predicament.'  Liability requires

affirmative state action; mere 'failure to protect an individual against private violence' does not

violate the Due Process Clause.") (citing *DeShaney,* 489 U.S. at 197, 200).

      In sum, Green did not take any affirmative action that created or increased a danger to the

Plaintiffs.  As in *Bright*, the "most that can be said of [Green] in this case is that [he] stood by

and did nothing when . . . circumstances dictated a more active role for [him]."  443 F.3d at 285

(citing *DeShaney*, 489 U.S. at 203).  This lack of affirmative action is fatal to Plaintiffs' state-

created danger claim.  Count IV is dismissed against Green.

### III.    State-Created Danger and Failure to Train, Supervise and Discipline Theories Against the School District and DCIU (Counts I & IV)[11]

      A municipality cannot be held liable for the unconstitutional acts of its employees on a

theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658,

691 (1978).  For independent municipal liability to attach under § 1983, first and foremost,

"there must still be a violation of the plaintiff's constitutional rights."  *Sanford v. Stiles*, 456 F.3d

298, 314 (3d Cir. 2006).  Then, the plaintiff must show that the municipality *itself* caused the

---

[11]     Third Circuit precedent requires the district court to review a plaintiff's municipal liability claim independently of his or her § 1983 claims against the individual state actors.  *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996).

constitutional violation at issue.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).   In other words, Plaintiffs must demonstrate that the violation of their rights was caused by a policy, custom or practice of the municipality.  *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996).  "Failure to" claims—failure to train, failure to supervise, or failure to discipline—are generally considered a subcategory of municipal policy or practice liability.  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014).

"To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was."  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).  If a plaintiff alleges that he or she was harmed by a custom, as opposed to a formally enacted policy, "[c]ustom requires proof of knowledge and acquiescence by the decisionmaker."  *Id*.  Failure "to allege conduct by a municipal decisionmaker" is "fatal" to a *Monell* claim.  *Id*.; *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 135, n.11 (3d Cir. 2010) (noting that plaintiff has "the obligation to plead in some fashion that [the decisionmaker] had final policy making authority, as that is a key element of a *Monell* claim.").  In addition, a plaintiff must establish causation by properly pleading that the municipality's policy or custom "was the source of [his or] her injury."  *Santiago*, 629 F.3d at 135.

Plaintiffs here plead that the School District and DCIU created the danger to Plaintiffs pursuant to various alleged policies (Count IV), as well as because the School District and DCIU failed to train, supervise or discipline Green (Count I).  The Court, therefore, will analyze both Counts I and IV together to determine (1) whether Plaintiffs have sufficiently alleged an underlying constitutional violation against the School District and DCIU (*i.e*., the state created danger claim); and (2) whether that violation was caused by a municipal policy or failure to train.

### A.   *State-Created Danger Theory*

Stripping away the threadbare recitals and mere conclusory allegations in the complaint as we must, *Iqbal*, 556 U.S. at 678, Plaintiffs fail to state a claim for state-created danger against the School District and DCIU for the same reason their claim fails against Green—because Plaintiffs do not identify any affirmative action taken by the School District or DCIU that created or increased a danger to the Plaintiffs.  A careful reading of the complaint reveals only four relevant allegations against the School District and DCIU:

> 15.    Before Dylan Fonner left the school on October 9, 2013, he went to the principal's office and told administrators that he feared he would be physically assaulted if he got onto the bus that took him that day.  The principal and administrators at DCIU **ignored his fear** even though Fonner made administrators aware of prior assaults on District School buses.

> 61.    The defendants placed plaintiffs in harm's way when their actions created and increased a danger to the plaintiffs by enacting and enforcing a policy that **denied Dylan Fonner alternative transportation home from school** when the principal's office of defendant DCIU was put on notice by the plaintiff that he believed he would be assaulted on his assigned bus to go home in.

> 66.    Defendants District and DCIU placed plaintiffs in harm's way and increased a danger to the plaintiffs as the defendants were on notice that numerous student assaults had occurred on buses designated for use by the County Alternative High School **without assigning additional aids or security** to buses to prevent assaults.

> 67.    Defendants District and DCIU placed plaintiffs in harm's way and increased a danger to the plaintiffs as defendants were on notice that numerous fights had occurred on buses designated for use by the County Alternative High School but still **forced the plaintiff to go home on a bus** even after plaintiff Dylan Fonner warned defendants that he feared he would be assaulted. Defendants merely could have called plaintiff's parents to arrange alternative transportation and thus prevented [sic] the plaintiff from being assaulted as it was imminently foreseeable that plaintiff would be assaulted on his bus.

(Am. Compl. ¶¶ 15, 61, 66-67) (emphasis added).

15

Plaintiffs are again attempting to "redefine clearly passive inaction as affirmative acts." *See Morrow*, 719 F.3d at 178 (rejecting the Morrows' description of the school's failure to expel Anderson as "permit[ing] Anderson to return to school after [her] suspension ended" and finding that this did "not suggest an affirmative act.") (emphasis omitted).  In reality, Plaintiffs are complaining that the School District and DCIU declined to exercise their authority to make different transportation arrangements for Fonner when he reported that he was being bullied— they failed to acknowledge his fear, failed to arrange alternative transportation home for Fonner, and failed to provide him with an aide or security guard on his bus ride.  Under *Morrow*, such failures cannot constitute affirmative acts or else "every decision by school officials to . . . decline to use their authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect. . . . the state-created danger exception would swallow the rule.  Schools would always be liable . . . for any injury that could be linked to either action or inaction.  Any and all failures to act would be transformed into an affirmative exercise of authority."  *Id*. (emphasis omitted).  Plaintiffs' contentions are unavailing under Third Circuit precedent.

This analysis does not change because Fonner told the principal's office that he had been bullied earlier in the day and that he feared he would be assaulted if he rode home with his bus mates.  Under *DeShaney*, "no affirmative duty to protect arises 'from the State's knowledge of the individual's predicament.'  Liability requires affirmative state action; mere 'failure to protect an individual against private violence' does not violate the Due Process Clause."  *Bright*, 443 F.3d at 284 (citing *DeShaney,* 489 U.S. at 197, 200).  The School District and DCIU's failure to make different transportation arrangements for Fonner put him in no worse position than he had been in before he walked into the principal's office.  As with Green, while perhaps it "can be

said [that] the state functionaries in this case . . . stood by and did nothing

when . . . circumstances dictated a more active role for them," *Bright*, 443 F.3d at 285 (citing

*DeShaney*, 489 U.S. at 203), such a failure to exercise state authority is not a violation of the Due

Process Clause. *See D.R.*, 972 F.2d at 1376 ("We readily acknowledge the indefensible passivity

of at least some school defendants under the circumstances.  Accepting the allegations as

true . . . that one school defendant was advised of the [student's sexual] misconduct and

apparently did not investigate, they show nonfeasance but they do not rise to the level of a

constitutional violation."); *Frazer*, 25 F. Supp. 3d at 611 ("Plaintiff has alleged only that Temple

did not do enough to prevent her from being harmed once it knew of Cerett's propensity for

violence . . . .  Absent allegations of such affirmative conduct by Temple, Plaintiff has failed to

allege sufficient facts to establish a viable claim under the state-created danger exception.").

　　　　Finally, with regard to the allegation that the School District and DCIU "forced" Fonner

to go home on the bus that day, the Court is not bound to accept conclusory allegations couched

as facts.  *Iqbal*, 556 U.S. at 678.  Nowhere else in the amended complaint do the Plaintiffs

corroborate, with factual allegations or otherwise, that the School District and DCIU commanded

Fonner to go home on the bus.  To the contrary, the amended complaint details the exchange in

the principal's office as one where the School District and DCIU merely failed to take the action

Fonner sought.  (*See, e.g.*, Am. Compl. ¶¶ 15, 61 (pleading that the School District and DCIU

"ignored" Fonner's fears and "denied" Fonner an alternative method of transportation home).)

The Court does not find that Plaintiffs' singular use of word "forced" here is enough to nudge

Plaintiffs' state-created danger claim "across the line from conceivable to plausible."  *Twombly*,

550 U.S. at 570.  More importantly, Plaintiffs do not allege that the School District and DCIU

restricted Fonner's freedom in any way to act on his own behalf and call his mother to arrange

for alternative transportation, especially given the fact that Plaintiffs have made clear to the Court that Fonner possessed a cell phone on the day in question.  (Am. Compl. ¶ 32; Pls.' Opp'n to Mot. Dismiss 15.)  As the *Bright* court observed, the absence of such an allegation is telling of a lack of an affirmative exercise of state authority creating a danger to Fonner.  443 F.3d at 284.

Even assuming that the School District and DCIU did affirmatively force Fonner to go home on the school bus that day, however, Plaintiff's constitutional claims against the School District and DCIU still fail because Plaintiffs have not sufficiently pled that a municipal policy or failure to train was the moving force behind their constitutional violation.

### B.  Municipal Liability for Policy or Failure to Train under Monell

In order to hold the School District and DCIU liable, in addition to pleading an underlying constitutional violation, Plaintiffs must demonstrate that the violation was caused by a policy, custom or practice of the municipality.  *Beck,* 89 F.3d at 971.  Failure to train claims are considered a subcategory of municipal policy or practice liability.  *Barkes*, 766 F.3d at 316.

In the amended complaint, Plaintiffs premise municipal liability of the School District and DCIU on both their actual policies and their failure to train Green.  With regard to the School District and DCIU's policies, Plaintiffs make two specific allegations:

> 42.    Defendant District and DCIU had a policy to keep children on a school bus until their assigned stops even while students were being battered, and facing an immediate threat of continued danger to life and liberty.[12]
>
> 61.    The defendants placed plaintiffs in harm's way when their actions created and increased a danger to the plaintiffs by enacting and enforcing a policy that denied Dylan Fonner alternative transportation home from school when the principal's office of defendant DCIU was put on notice by the plaintiff that he believed he would be assaulted on his assigned bus to go home in.

(Am. Compl. ¶¶ 42, 61).

---

[12]    Plaintiffs repeat this exact allegation in paragraph 51.  (*Compare* Am. Compl. ¶ 42 *with* ¶ 51.)

Neither of these paragraphs sufficiently alleges a municipal policy under *Monell* at the 12(b)(6) stage.  The Court is not bound to accept as true conclusory statements couched as factual allegations.  *Iqbal*, 556 U.S. at 678.  "Policy is made when a 'decisionmaker possessing final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict."  *McTernan*, 564 F.3d at 658 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  Plaintiffs do not allege that a School District or DCIU policymaker commanded that children be kept on school buses while being battered, or that a School District or DCIU policymaker ordered that Fonner be denied alternative transportation home.  Indeed, Plaintiffs do not allege any policymaker at all in the amended complaint, which is "fatal" to their *Monell* claim.  *Id.*; *see also Castro v. Del. River Port Auth.*, No. 13-cv-4467, 2014 WL 2916506, at *6 (D.N.J. June 26, 2014) (holding that plaintiff failed to state a plausible claim for relief for municipal liability because, *inter alia*, his "vague and cursory allegations" did not even identify "a decisionmaker at the DRPA or PATCO").  Rather, the amended complaint offers only bald assertions that these policies existed without any facts to support that what happened to Plaintiffs was not the result of "idiosyncratic actions of individual public actors."  *Kane v. Chester Cnty. Dept. of Children, Youth & Families*, 10 F. Supp. 3d 671, 688 (E.D. Pa. 2014) (citation omitted).  Such bald assertions are not entitled to a presumption of truth under federal pleading standards.  *See Iqbal*, 556 U.S. at 678; *Twombly,* 550 U.S. at 555-56. The amended complaint fails to sufficiently allege a municipal policy that directly caused Plaintiffs' injuries.

Plaintiffs also contend that the School District and DCIU failed to train Green, which caused Plaintiffs' injuries.  Where a plaintiff alleges that the municipal policy that caused the injury in question concerned a failure to train, supervise, or discipline, the plaintiff must

demonstrate that (1) the failure amounted to a deliberate indifference to the rights of persons
with whom the municipal employee comes in contact; and (2) the municipality's policy of failing
to train, supervise, or discipline actually caused the constitutional injury. *City of Canton,* 489
U.S. at 388; *Montgomery v. De Simone,* 159 F.3d 120, 126-27 (3d Cir. 1998).

With regard to the School District and DCIU's purported failure to train, supervise, or
discipline Green, Plaintiffs specifically allege:

> 41. Defendant District and DCIU failed to have a policy or
> procedure to train defendant Green regarding what actions to take
> during a student assault on a school bus.
>
> 43. Defendant District and DCIU failed to have a policy or
> procedure to train employees regarding actions to be taken if an
> emergency occurred on its bus.
>
> 48. Defendants District and DCIU failed to train its bus driver
> employee, defendant Hykeem Green, with respect to the
> constitutional, statutory and departmental limits of his employment
> authority.
>
> 50. Defendants District and DCIU were aware that numerous
> student assaults occurred on their school buses and did nothing to
> train and supervisor [sic] their bus drivers regarding policies and
> procedures to protect students from assaults and report assaults to
> the police and the district.
>
> 52. Defendant District and DCIU failed to train employees
> regarding actions to be taken if an emergency occurred on its bus.

(Am. Compl. ¶¶ 41, 43, 48, 50, 52.)

Failure to adequately train, supervise, or discipline municipal employees can ordinarily
be considered deliberate indifference only where the failure has caused a pattern of violations.
*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-09 (1997). Although it is
possible to maintain a claim of failure to train without demonstrating such a pattern, *Bryan
County* makes clear that the plaintiff's burden in such a case is high. *Id.* at 409 ("In leaving open
in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without

showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations"); *accord Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) ("[A] municipal policy or custom that amounts to deliberate indifference . . . . typically requires proof of a pattern of underlying constitutional violations.  Although it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task.") (citations omitted).  Without a pattern of past violations, a plaintiff has to "show both contemporaneous knowledge of the offending incident . . . and circumstances under which [a municipal] supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery*, 159 F.3d at 127 (citing *Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 25 (3d Cir. 1997)).

Unlike their original complaint, Plaintiffs now seem to allege a 'pattern of violations' theory by pleading that the School District and DCIU were aware that prior "numerous student assaults [had] occurred on their school buses."  (Am. Compl. ¶ 50.)  But merely alleging the existence of prior incidents, without more detail about those incidents, is not enough to survive a Rule 12(b)(6) motion.  *See Kane*, 10 F. Supp. 3d at 689 ("[T]he Second Amended Complaint does not plead sufficient facts to support a reasonable inference of a 'pattern of similar constitutional violations by untrained employees' . . . . The facts pled describe a single incident which is by definition insufficient") (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)); *Garcia v. Cnty. of Bucks*, 155 F. Supp. 2d 259, 268 & n.13 (E.D. Pa. 2001) (dismissing failure to train claim where "no facts are alleged to support the conclusion that there is 'a pattern or practice of the County of falsely arresting people'" and plaintiffs "refer[red] only to prior acts

of 'police misconduct' generically"); *see also Moriarty v. DiBuonaventura*, No. 14-cv-2492, 2015 WL 1469515, at *2 (D.N.J. Mar. 30, 2015) ("Although Plaintiff now pleads that DiBuonaventura had a 'pattern and practice' of making illegal traffic stops . . . there are no additional factual allegations in the Amended Complaint which would support this conclusion. The factual background remains unchanged from the original Complaint, and refers only to the single traffic stop made by DiBuonaventura.  Plaintiff's new allegations of 'pattern and practice' are unsupported and as such, are not entitled to the assumption of truth.").

The amended complaint is devoid of any reference to any other specific occasion where a student-on-student assault occurred on a school bus.  The paragraphs alleging deficient training, supervision or discipline mention no other student whose rights were violated because of the School District and DCIU's alleged deficiencies.  Without any supporting details, Plaintiffs fail to allege deliberate indifference under a pattern of violations theory.  *See Swope v. City of Pittsburgh*, --- F. Supp. 3d ----, No. 2:14-cv-939, 2015 WL 500922, at *9 (W.D. Pa. Feb. 5, 2015) ("Mr. Swope has alleged in the Complaint only that the City of Pittsburgh has 'exhibited a long standing, clearly indifferent pattern of behavior as to the actions of its police officers,' which 'has allowed officers such as defendants . . . to repeatedly violate laws;' . . . . These general assertions, however, are simply conclusions and devoid of any facts from which it could be inferred that there has been a pattern of similar violations"); *accord Walker v. N. Wales Borough*, 395 F. Supp. 2d 219, 226-27 (E.D. Pa. 2005) ("The Plaintiff has not satisfied his burden of alleging facts sufficient to support his claim of municipal liability. . . . Plaintiffs' Amended Complaint summarily asserts the Township has 'encouraged, tolerated, ratified and

been deliberately indifferent to [certain] patterns, practices and customs,' without referencing any specific facts supporting the 'who,' 'what,' and 'how' of that allegation.").[13]

Plaintiffs argue that the School District and DCIU were "on actual notice of the need to train, supervise, discipline or terminate Green, prior to the incident in question, as other similar criminal acts, specifically false imprisonment, had been perpetrated by Green either during or before the scope of his employment."  (Am. Compl. ¶ 49; *see also* Pls.' Opp'n to Mot. Dismiss 17.)  The relevant question under a pattern of violations theory, however, is not whether Green engaged in violence, but whether other students did.  As the amended complaint is devoid of any facts showing a pattern of student-on-student violence during bus trips, Plaintiffs cannot allege that the School District and DCIU were deliberately indifferent to such a risk.  Plaintiffs fail to sufficiently allege that the School District and DCIU acted with the deliberate indifference necessary to sustain a claim for municipal liability.

Finally, the amended complaint also fails to sufficiently allege municipal liability because Plaintiffs do not show how any of the alleged training deficiencies of the School District or DCIU directly caused the student bullies to attack Fonner and Buonadonna on the bus.  Plaintiffs bear the burden of showing that the School District and DCIU's failure to train proximately caused their injuries, *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007); this they have not done.  There are no facts to suggest that the students' attack in this case was the direct result

---

[13]     Although the Plaintiffs do not allege a single violation theory, as the Court explained in its March 3 Memorandum Opinion, Plaintiffs' failure to train claim falls short under that standard as well.  The amended complaint fails to allege any action or inaction by the School District or DCIU that could be interpreted as encouraging Green's alleged offensive behavior.  Plaintiffs never identify any examples of specific training that the School District or DCIU failed to provide, nor do they explain any shortcomings in the School District's or DCIU's supervision or disciplinary policies vis-à-vis Green.  Plaintiffs' allegation that Green was never disciplined after the incident on October 9, 2013 misses the mark.  Under *Monell*, the School District's and DCIU's alleged failure to discipline has to be the "moving force" behind the deprivation of Plaintiffs' constitutional rights.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  Here, Plaintiffs appear to allege that the School District and DCIU failed to discipline Green *after* the alleged wrongdoing, not before.  Any subsequent discipline the School District or DCIU imposed upon Green is irrelevant to the analysis of Plaintiffs' municipal liability claims.

of the School District and DCIU's failure to train its employees, as opposed to the student bullies' individual actions.  *See D.R.,* 972 F.2d at 1376 ("Plaintiff's harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability [under the state-created danger theory]."); *K.S.*, 2007 WL 1009815, at *4 ("K.S. has failed to establish that any of Wilson's actions or inactions were the 'but-for' cause of S.M.'s alleged constitutional harm.").  Plaintiffs' claims against the School District and DCIU in Counts I and IV are accordingly dismissed.

### IV. State Law Claims for Intentional Infliction of Emotional Distress and False Imprisonment Against Green (Counts II-III)

Because all of Plaintiffs' federal claims against Defendants must be dismissed as currently pled, and those federal claims are the sole basis for Plaintiffs' assertion of this Court's jurisdiction, (Am. Compl. ¶ 8), the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against Green.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim [if] the district court has dismissed all claims over which it has original jurisdiction . . . .").  Plaintiffs' claims against Green for intentional infliction of emotional distress and false imprisonment are therefore dismissed without prejudice.  Plaintiffs are free to reassert their tort claims against Green in state court and may exercise their transfer right under 42 Pa. C.S.A. § 5103(b) to avoid any statute of limitations problem.

### Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted.  Plaintiffs do not seek leave to amend.  However, "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."  *Alston v. Parker*, 363 F.3d

229, 235 (3d Cir. 2004) (citing *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.

2002)).  At the same time, "repeated failure to cure deficiencies by amendments previously

allowed" is among the justifiable reasons to deny leave to amend.  *Foman v. Davis,* 371 U.S.

178, 182 (1962).

Plaintiffs have previously been granted leave to amend their complaint; the amended

complaint represents the second version of Plaintiffs' operative pleading.  After the filing of each

version of Plaintiffs' complaint, the Defendants have moved to dismiss, challenging Fonner and

Buonadonna's claims on numerous grounds.  Oral argument has been held.  Still, Plaintiffs have

been unable to cure their pleading's deficiencies.  Considering the submissions to date, granting

Plaintiffs leave to amend their complaint again would be futile.  Allowing Plaintiffs a third

complaint cannot change the dispositive issues here:  that Green's failure to let the Plaintiffs off

the bus does not constitute an affirmative act under binding Third Circuit precedent, that the

School District and DCIU's failure to arrange alternative transportation home for Fonner is not

an affirmative exercise of state authority in the Third Circuit, and that no municipal policy or

failure to train directly caused the student bullies to attack Fonner and Buonadonna on October 9,

2013.  Although sympathetic to the Plaintiffs' and the assault they endured at the hands of their

schoolmates, the Court is compelled to dismiss Plaintiffs' claims.

An appropriate order follows.


 */s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.